The case on our docket this morning is 23-50224 Little v. Llano County, Mr. Mitchell. Thank you, Your Honors, and may it please the Court, 29 years ago, this Court held in Campbell v. St. Tammany Parish School Board that the speech clause limits the authority of librarians and school officials to remove books from a government-owned library. Holding is wrong and should be overruled. Campbell is wrong because a librarian does not and cannot abridge the freedom of speech by weeding or removing a book from a public library or from a school library. The government has no constitutional obligation even to provide these libraries, and it has no constitutional obligation to include any particular book within a library's collection. The speech clause may prevent the government from punishing or penalizing those who seek to access information and ideas, but it does not require the government to assist or facilitate anyone's efforts to obtain a particular book, and it does not require Llano County to preserve access to library books that it previously provided as a matter of grace. Our Constitution is a charter of negative rights, not positive rights, and the plaintiffs cannot compel Llano County or any other governmental unit to open a public library, to add any particular book to a library's collection, or to keep any particular book on the library's shelves. The most straightforward way to overrule Campbell is to hold that library curation decisions are government speech. The Supreme Court's recent decision in Moody v. Net Choice holds that presenting a compilation of speech originally created by others is speech that belongs to the curator. That means that the public library's curation decisions are speech, and they can only be speech that belongs to the government and not a private party. These library curation decisions in a government-owned library cannot possibly be considered private speech because the librarian who reads a library book is acting within the scope of her government employment, but if a court rejects our government speech argument, it should still overrule Campbell because the government does not and cannot abridge the freedom of speech by failing to include the preferred books within a public library's collection. The situation in this case is no different from a government that decides to withdraw or remove all handguns from a government-owned store, and it is no different from a governmental unit that decides to remove or cancel abortion services that were previously offered at a government-owned hospital. Campbell should be overruled because the government has no obligation to affirmatively assist those who seek to exercise a constitutional right, even if the government has previously provided that assistance, and the government's refusal to provide desired assistance does not abridge the freedom of speech or any other constitutional right. I welcome the court's questions. Mr. Mitchell, does this have any application for the use of the rooms at the library for the story hours from the certain groups on either cultural battle side? Does this have any implication for those use of the spaces at the library? I haven't thought through that particular question, Judge O'Rourke, but my immediate reaction would be that I think the answer to Your Honor's question will depend on whether access to any of these rooms or spaces in the library somehow creates a limited public forum, and to determine that, I think the court would have to look carefully at how the library has permitted access to these types of rooms in the past, much like the analysis the Supreme Court conducted in Charlotte with respect to the flags that were being raised on Boston City property. So if the library has been very generous and open to all comers and hasn't really imposed any particular restrictions in the past, that would counsel in favor of a finding of a limited public forum. If it's been more selective and exclusionary of certain groups that are either espousing views that the library objects to or engaged in the perhaps propagation of content that the library does not wish to assist in propagating, then that might be more of a government speech type of cubbyhole. So it's going to be a very fact-bound and very fact-intensive inquiry, so I'm somewhat reluctant to just opine on that question in the abstract. Thank you. Mr. Mitchell, why wouldn't your government speech argument be waived or forfeited? It's not waived at all, Your Honor, because we could not make this argument before the panel consistent with Campbell. This is one issue on which the plaintiffs and us agree. Campbell foreclosed our government speech argument because the argument we're making is that public library curation decisions and school library curation decisions are government speech simply by virtue of the fact that the government owns both of these libraries. We could not, in our argument, draw the distinction that Judge Duncan drew in his dissent, where he suggested a different type of government speech argument that was limited only to public libraries, and he tried to distinguish school libraries to get around Campbell. That is not the argument we have ever made in this litigation. We did make this argument in the district court. It's in Docket Entry 42, and plaintiffs responded to our motion dismissed by pointing out correctly that Campbell forecloses this argument, and we could not, consistent with our ethical obligations to the district court or to the three-judge panel, continue to press an argument that was directly foreclosed by the binding precedent of this court. It's no different for Mississippi. When it was seeking to overrule Roe against Wade in Dobbs, it did not present those arguments in the district court for why Roe should be overruled in order to present the arguments to the three-judge panel of this court that heard Dobbs before it reached the Supreme Court. It waited until it filed its certiorari petition, and at that point, only at that point, did it first attack Roe against Wade and present its arguments for overruling Roe. We are taking the same approach here, and that's proper. We respect the precedent of this court, even though we disagree with it, and when we argue in the district court, we're going to argue with the hand we've been dealt, which includes the binding precedent of this court, and we had no way of getting around Campbell at that time. On the government's, on the theory of libraries as government speech, exempt from First Amendment restrictions, three questions. One factual, two legal. Factually, I'm curious to hear who you would say was the government speaker here, because I think the testimony from Milam, Judge Cunningham, Rochelle Wells, all was that they never read books like Caste or KKK. They didn't read them. So, curious who the government speaker is. Then legally, am I correct that no federal court has ever asserted this view as to public library book removals, that those removals are exempt entirely? And can you keep in track a third one? I believe I can. In fact, then that question, just yes or no, has any court espoused the theory you're urging? The third question is a limiting principle one. In terms of, your opponent points out, wouldn't this lead to silos of partisanship, which I read to be Rehnquist's concern in Pico. Alito then says it again when he talks about cover for censorship in Shurtleff. In other words, could books, libraries elsewhere say, books on hunting, books on the crucifixion, those depict violence, we think they're harmful, we get to pull them out of government speech? So, I'll go in the order in which your Honor asked the question. Number one, who's the government speaker? Has to be Amber Milam, the head librarian, because she's the only person who had the authority to read these books, and she was the ultimate decision maker on whether the books should be read. There were other people involved who expressed objections to some, but not all, of these books in the library. They did so in their capacity as private citizens. Bonnie Wallace, at the time she sent the email criticizing some of the library books, she was a private citizen. Rochelle Wells, when she sent her email, she was also a private citizen. I don't see how any of that can be characterized as government censorship. It might be a more questionable question if they were holding government office at the time, but they weren't at the time they sent these emails. They were on the reconstituted advisory. They are, yes. Okay, go ahead. I appreciate that correcting. So, your Honor's second question is, has any court adopted this argument where maybe, no, we have not found one. And we have not found any court that has even said that library reading decisions are per se exempt from speech clause scrutiny, which is sort of our backup argument to government speech. We haven't been able to find any court to say that yet. I don't think that's fatal to our position. We're relying heavily on Moody against Net Choice. That case helps us a lot more than any of the precedents that Moody against Net Choice relied upon. I think if you look at the decision of Hurley with the parade, that's easily distinguishable from the library situation. There's a line in Justice Sousa's opinion that talks about the parade being analogous to an orchestra director conducting a score. That's not really what goes on when a librarian is making curation decisions within a library. And I think the newspaper case of Miami Herald is also easily distinguishable from the library. Moody against Net Choice comes out very strongly and says that curation decisions are independently speech of the curator. And this court, prior to the Supreme Court's ruling, held otherwise. It ruled against the internet service providers in that case. And that decision was stayed. I'm not suggesting that was binding precedent or not at the time. But the legal landscape has changed since Moody against Net Choice came out. And then your third question was, and could Your Honor please remind who's the limiting principle? Alito's concern about cover for censorship, Rehnquist's concern in PICO. Could libraries elsewhere with different community political viewpoints take out books on hunting? Because those depict violence that are harmful to kids. Well, I believe they could under the speech law. I would not support that as a matter of policy. And I would hope there would be political constraints in place that would deter them from doing that sort of a thing. But I also would suggest to the court, there may be other legal constraints in play here. Number one, if there's racially motivated book removals, there are all sorts of laws that could come into play here. 42 U.S.C. 1981 would prevent the library from just saying we're not going to buy any books that were written by black authors. There could be restraints imposed by the Equal Protection Clause if there's racially motivated book selection or book removal policies. There could be equal protection constraints if there's sex discrimination in the accumulation of books. And still, at the very end of the day, Judge Higginson, there still will be rational basis for people under the Equal Protection Clause. So if there's something akin to a bare desire to harm a politically unpopular group, the sort of language you see in the Moreno opinion, that might be a possible way for a plaintiff to get into court if there is one of these just irrational book removals that can't be explained other than hatred or hostility or prejudice. What about religious discrimination, Mr. Mitchell? Would that be, for example, if the book, Gay Girl, Good God, which has to do with a person who's gay, but then she ends up in a heterosexual marriage over a period of time and discusses her faith journey, I believe, is the book. Would that be a book the library could call because they would find it offensive, that that was outdated or something, and then could the religious people say that can't be called because it discriminates against their rights to religious views or something? Or is that because it's all under the First Amendment umbrella, it would just be a curation decision? Well, under the speech clause, it would be a curation decision. There might, under Your Honor's hypothetical, be a potential frame under Supreme Court Establishment Clause doctrine. I think we'd have to know exactly what the reasons were for removing that book, but he did mention it had religious overtones. So if there is hostility toward a religion or a desire to promote a particular religious view over another, there might be a way into court on an Establishment Clause theory. We're not ruling any of that out in our brief. Our argument is limited to the speech clause. There may very well be other constitutional constraints. There may be other federal law constraints. There may even be state statutes that could constrain libraries if some local communities start to engage in abusive practices. We have seen states, like Washington State, recently enact laws that limit the ability of school officials and local officials to remove books from public libraries. So I don't think we should fall into the fallacious view that just because the speech clause doesn't present constraints, therefore it means that anything goes and all these parade of horribles could occur. There still can be other laws in place, and there can be new laws enacted by the state legislature, by Congress, by other entities that can curb abuses if those abuses were to occur. I don't think this situation can be distinguished, Judge Weiner. We could try to make the argument that Judge Duncan made in his dissent about how school libraries should be subject to a different set of rules than public libraries. I just don't think we can do that with respect to government speech. These are both government-owned libraries. I think it is right to point out that in the school situation that courts have said that school officials act in loco parentis, so therefore they should have more authority, perhaps, to control what's in the curriculum. But that distinction cuts against us, not for us. So that's why we're really not trying to rely on the idea that school libraries should be subject to a different set of rules than public libraries. What we recommended in our brief is that the court respectfully disagree with the Eighth Circuit, and I think there's no way to overrule Campbell without creating a circuit split with the Eighth Circuit on this question, and that's unfortunate, but I think that's just the reality of what we're facing right now. Counsel, isn't Moody distinguishable because of his private speech that was involved in Moody curating decisions by those platforms or whatever, private speech? We can't determine what is government speech until we go through the shirtless factors. Response? That's correct. So Moody is a case about private speech, but what Moody holds, and I think what binds this court, is that it is speech of some sort, and then it's up to this court to decide whether the leading decisions of Amber Myvlin should be characterized either as government speech or as private speech. And to determine that, the court would apply the shirtless factors. What we're saying is that Moody requires a view that is speech activity, and it doesn't weigh in on the jurors. Accepting this only part of the analysis, we can't stop with Moody, even if you're right. We have to then figure out, are these expressions consistent with the That's correct, yes. And we don't think about Mattel, the TAM, or whatever the name is, trademark case. Yes, Mattel against TAM. It says, while the government speech doctrine is important, it's a doctrine that's susceptible to dangerous misuse. If private speech could be passed off as government by simply affixing a government seal of approval, government could silence them off on unfavorable ideas. It seems to me that there is a risk of that occurring here, that we are calling this particular activity that occurred in this library government speech, when in fact it is suppression of unpleasant, unacceptable ideas to some group of people. The reason we don't think that's a concern, Judge Southwick, is because we've made clear in our The library books themselves do not become government speech, simply by virtue of their inclusion in the public library. Just as the Supreme Court held in Mattel against TAM correctly that the trademarks do not become speech of the government, simply because the PTO decides to register those trademarks. They're still private speech. It's speech of the author in the case of the books. It's speech of the person who created the trademark in the case of Mattel against TAM. All we're claiming is that the decision to curate, to include or exclude a book from a library's collection. That decision and that decision alone constitutes government speech. And when our request for the holding is limited in that fashion, it doesn't raise the concerns of censorship that so troubled the court in Mattel against TAM. What the court was worried about is that if we call the trademarks themselves government speech, they could potentially be censored. And they also raise the same concern with respect to copyright law. But here, we're only saying the curation decision is government speech. We can't censor the library books or ban them in the traditional sense of the word censor and ban, not in the way the plaintiffs are using that term. We can't ban that speech just by calling it government speech, because the books don't become government speech. Mr. Mitchell, I was a little bit surprised in your briefing that you didn't place more emphasis on the Walker case. You barely mentioned it. I'm partial to that decision because it vindicated my dissent in that case. I guess I placed some emphasis on it. But it seems to me that under Walker, this is a slam dunk for the definition of government speech. The court said, Texas maintains direct control over the messages conveyed on its specialty plates. This final approval authority allows Texas to choose how to present itself in its constituency. That's exactly what's happening in the library in terms of the final authority. But I'm curious, there must be a reason why you haven't placed more weight on that. I'll confess, Ron, I'm also somewhat partial to Walker because I unsuccessfully argued before your Honor the position that your Honor adopted when the panel disagreed both with your Honor and with me. But the reason I didn't place more heavy emphasis on Walker was because in the license plate context, the state is so actively involved in creating the plate, pounding out that plate into a state-issued document, not document, but a thing that goes on the car with the state's name on it. And with a library book that's just being put on the shelves, it's not quite the same way that the state is embracing the message. And that's what troubled me about relying on Walker. The other problem I saw with Walker was we didn't want to suggest in any way that the library books became government speech. And with Walker, the design was adopted by the state, even though it was created by a private citizen. And the Supreme Court's holding on Walker seems to say that that license plate design itself becomes government speech when it starts to appear on license plates. So that's what troubled me a bit about relying on Walker. And Moody against Net Choice didn't present any of those I think it is somewhat helpful for us, but it's not quite a slam dunk for us in the way that I think the quality of Net Choice is. The court has no further questions. I see my time has expired. I've saved five minutes for rebuttal. Thank you, Your Honors. Mr. Whitaker. Thank you, Your Honor, and may it please the court. Henry Whitaker, from the Florida Attorney General's Office for the State of Michigan. I want to start off with some of the questions that the court has asked about the limiting principle that is on the government speech argument. It is important, I think, as Mr. Whitaker said, to understand the content of the books themselves and the message the government is sending in selecting and removing books. The government is not adopting the content of the books as was, I think, the Supreme Court's concern in the tall, where the government's claim, I take it, was that it was the content of the trademarks themselves that the government was essentially adopting as its own. And I think, Judge Higginson, that was some of what Judge Alito was reacting to in his separate opinion in Shirtless, in asking about the dangers of government censorship and the like. But he carved out, in that opinion, if you'll recall, the situation which we have here, which is where the government has voluntarily, where an author has, or a speaker, has voluntarily put forward its speech product, your books, and the government has adopted that as its own. There's no question of, I think, compelled speech in that instance. And I think the Summum case, which Judge Alito points to in his Shirtless concurrence as well, is a very good example of this. And we rely on Summum as our principal analogy, because Summum did involve Judge Stalbwick, a case of government speech. And it equally involved an instance in which the government was taking privately created, expressed their products, in that case it was monuments, and establishing and presenting to the public an expressive compilation of its own that expressed the message that the court thought was quite distinct from the monument itself. Please. Only if you don't have uninterrupted time. So you're welcoming questions. Just with your perspective, looking at the states across the board, would you agree with me that states like Louisiana have approached the same concern about protecting children in a way that causes far less friction with the First Amendment, in that what they've done, as I understand it, is empower parents to limit their own children's access to books on library cards, as distinct from allowing parents through advisory boards to take books away from any and all parents using the library? Do you understand my question? Is there less First Amendment friction, if a state's approach to protecting its children, if that's its theory, in public libraries, is to empower parents to restrict their own children, as distinct from removing the books entirely? I don't think that makes a First Amendment difference. Judge Higginson, I think there's equally no, maybe perhaps there are differences in policy there. I don't think that there's a First Amendment problem, though, when the state makes viewpoint based, removes books on a viewpoint based basis in a public library. Those kind of determinations are the very essence of what it means to provide a public library. A public library is supposed to provide a selection of books for the enlightenment and enrichment of the community, and as a matter of necessity, it is needed to, in the words of Chief Justice Rehnquist in the American Library Association, separate out the gold from the garbage. And I think as Judge Duncan noted in his panel dissent, it would be essentially impossible to perform that task without giving the government the constitutional authority to make viewpoint based decisions. And also, are you making that independently of the government speech argument, to look at ALA, American Library Association, which isn't talking about that? Are you saying that's a right, regardless of what we do with government speech, that's an independent reason to rule in your favor? Or is it part of this teasing out what government speech means in this situation? I think both of those things. Judge Stauffer, I think, I guess, I mean, I think that it works independent of the government speech argument. Obviously, we agree with government speech argument. Let me just comment on the ALA case. I mean, ALA, of course, did not straight out say that the provision of books at a public library was government speech. It did, however, reject the notion, I think, that any kind, that the public library provides any kind of a speech form in providing books, including a limited public form, which I think necessarily implies that viewpoint the court endorsed, at least the plurality there. It's not a binding opinion. It didn't command a majority. I think the analysis is quite persuasive, though, which necessarily means that viewpoint based determinations would be just fine, as far as the plurality of the American Library Association goes. And I do think Mr. Mitchell is right that another way to look at this case is, even if the court had concerns about whether, in fact, a public library is producing an expressive product, it's, there's still no affirmative right to have the state provide you with a piece of information. That's my question. Can we decide this case on who's got what personal rights from the standpoint of users of the library without getting into whether the librarian or the county has government speech rights? Yes, I believe you can. I believe you could say, and Mr. Mitchell makes this argument in his reply brief, that the selective provision of a government benefit as part of a government program, where that restriction is, you know, reasonably necessary to administering the program, and here we're talking about viewpoint-based restrictions on the provision of library books, that falls in the heartland of cases where the Supreme Court had said that the government does not have an obligation to subsidize constitutional rights. The case would be quite different if, for example, the government tried to impose an unconstitutional condition on imposing a government in the library. I mean, if the government said, for example, you know, only Republicans can check out books or something, that would be quite a different case than the government making viewpoint-based decisions about what books can and can't be part of the library. That, of course, is an integral part of running a library, and the Supreme Court, going back to cases such as Russ v. Sullivan, has recognized that if you have conditions that are a valid incidence of running a government program, then that's not an unconstitutional condition, and the government can do that. There's no right to a gratuity under the Constitution. What if the librarians have personal animus against the authors? Would that be, would that, does that complicate things or not at all? It might complicate things, Judge Elrod, to be sure. If you had, you know, let's say, personal animus against the author, I think that would be perhaps a different case. The government speech argument is just to say that the free speech clause, as a general matter, does not regulate the selection and removal of books, and as your, I think your first question to Mr. Mitchell quite rightly pointed out, the analysis may well be different as the other functions that the library provides that are not necessarily in the selection and removal of books. The provision of rooms, of course, would be, had to be governed by a completely different analysis. We'd have to look at, we'd have, okay, thank you. Thank you, Your Honors, and may it please the Court, Matt Borden on behalf of Finance. American public libraries are a magical place where anyone can go and learn about a wide variety of topics. In libraries, just like everywhere else, the First Amendment prevents the government from getting rid of ideas that it disagrees with. That was the standard that this Court set out in Campbell. Libraries have wide discretion over their collections, but they cannot get rid of books when their substantial motivation is based on the viewpoint. Campbell has been the law in the circuit for 30 years without a flood of litigation or other difficulties that my friends have alluded to, and it's built on solid First Amendment foundation. It's built on PICO, where they were dealing with decades of First Amendment jurisprudence, and PICO itself, eight of the justices, stated that they would have ruled and adopted a view very similar to what this Court did in Campbell. It dovetails with every other line of First Amendment jurisprudence. The Forbes case, where you have a non-public forum and the government can't discriminate by viewpoint. The Finley case and that line of authorities, where you have no right to a government subsidy, but if they're going to have a government subsidy program, they have to administer it in a way that does not discriminate by viewpoint. And then there's the Rosenberger line of cases, where the government is making available funds to offer a wide variety of viewpoints and ideas to the public, and at that point, it can't pick and choose among the ideas based on viewpoint. The one through line that's running through all these cases is that the government cannot discriminate by viewpoint, because that is the core of what the First Amendment prohibits. Defendants' rule would overthrow all these cases, and it would turn libraries from institutions of knowledge and education and learning and ideas into political institutions. And that was a correct observation by Judge Higginson, that that's exactly what would happen, and the protections that they've offered in terms of other government amendments don't get rid of the big problem, which is political speech, because if they were correct that the government could do whatever it wanted with books in a library, the national government could pass a law that outlawed any viewpoints in a library that discriminated or differed from what it wanted. And that's why the Supreme Court has said to be very cautious in the call about expanding the government speech doctrine, because unlike the First Amendment, which has been written into the Constitution for 233 years, the government speech doctrine is a judge-made rule of relatively recent vintage that it chews into the First Amendment. And when you have it being used to do the things that the First Amendment doesn't allow, discriminate by viewpoint, suppress unpopular ideas, the government can enter into the marketplace of ideas when it puts up a monument or wants to say something affirmatively, but when it's suppressing ideas, it's creating dysfunction in that market, and the doctrine has to give way. Removal of a book is not government. There's no clear message that's being sent. It's like Mattel, where you have trademarks, all of the messages, and when you have a platform that the government offers and it's not endorsing the message of any of the that is not government speech. And that was the case in Mattel, and this case is exactly like that. They had a curation issue in Mattel, and the court said, no, the government would be prodigiously babbling if it actually adopted all those messages. And that was the same holding by the Eighth Circuit in Reynolds, and it's consistent with the policy of the Llano County Library, which says, in no case should any book be excluded because of race or nationality or the political or religious views of the writer, and material should not be prescribed or removed from the library shelves because of partisan or doctrinal disapproval. This is a situation where the government has said that it's not speaking and that it's not adopting the messages of these books, and that puts it exactly square on with Mattel. No court, as my friend agreed, has ever adopted this government speech argument, and this court should not be the first. I welcome the court's questions. Counsel, as I understand your position before our court, you're saying the First Amendment says to a librarian, if you remove a book because you are a librarian, that's what I'm hearing you saying. That's correct. Right? So the parties talk a lot, and the amici talk quite a bit about weeding, the weeding process and the crew method. Your brief, page 3031, says weeding is based on neutral criteria. It's more akin to maintenance work than intentional control of specific content. And then I noticed the American Library Association filed an amicus brief saying weeding is not the removal of books with inappropriate ideas or viewpoints. It is not a deselection tool for controversial materials. So the way I see the parties presenting this is that viewpoint discrimination is bad. It violates the First Amendment. But weeding is something necessary that libraries do all the time, and that's been my understanding of the case from the beginning. But since we're at en banc, I thought I'd go and look at the weeding guides, which are cited in the briefs, the Texas Weeding Guide, the ALA Weeding Guide, just to sort of check and make sure that, in fact, weeding is really a non-ideological viewpoint neutral exercise. So here's what I find. I mean, I've got the weeding guide here. Here's what the Texas Weeding Guide says. It's described as the Bible of library curation. The Texas Weeding Guide says librarians should weed biased, racist, or sexist views. Stereotypical views of people with disabilities or the elderly. Outdated philosophies on sexuality, marriage, and family life. Biased or inflammatory items about immigration. Gender or race bias. Children's books with erroneous and dangerous information. That's the Texas Weeding Guide. It's telling librarians to weed these books. So I ask you, isn't that, in and of itself, viewpoint discrimination that's in the Texas Weeding Guide? In other words, aren't libraries, according to the Bible of curation in Texas, already engaged in viewpoint discrimination, selection of some viewpoints over others, in making their curation decisions? There's a couple parts to the answer here, Judge Duncan. First of all, this Weeding Guide was added to or attempted to be added to the record by defendants after the close of evidence. It's cited in the American Library Association brief at page 9, note 26. And there wasn't a single piece of testimony on this guide. All of the librarians in this case, defendants and plaintiffs' side, testified that they followed the must-see factor. What does the M stand for? Misleading. How do you make a misleading determination without judging the viewpoint of the speaker? I think misleading is a factual category. It's a content-based discrimination or content-based rule that would, regardless of the viewpoint of the speaker, would prohibit it in this narrow category if you could prove something was actually factual. So this is the ALA's Weeding Handbook. Libraries would do well to remember the first M in must-see is misleading. Crew goes even further to define that material that contains biased, racist, or sexist terminology or view should be weeded. But I don't understand how you can make a misleading determination without determining the viewpoint of the speaker. I think you can look at facts. Facts can be misleading, like Judge Duncan pointed out in his dissent. If you have Pluto as a planet, that would be factually untrue because the science on that has changed. Mr. Borden, I thought when you say facts, I thought the first witness here, the head librarian, Martina Castellana, who was not cross-examined at all, said books like KKK and Caste were not removed either according to policy or must-see or crew. I thought the facts faced by this district judge was that these arguably neutral standards were not applied to the racial history books that were removed from this library. That's correct, Judge Higginson, and all of the books that were removed, with the possible exception of Freak Boy, did not meet any of the must-see standard or the standard for removal under must-see. Counselor, let me just ask you, I asked your co-counsel at the panel argument stage, if a public librarian found in the public library the autobiography of David Duke, a racist book, that says black people are inferior, I asked your co-counsel, does the First Amendment allow the librarian to remove the book? She said no. What's your answer? My answer is still no, Judge Duncan. Okay, so you have just said that the crew guide for Texas libraries is facially unconstitutional. Is that your position? We don't know how this crew guide is actually applied in practice, and just by way of example, the Lanham County Public Library has mine confident. That is a racist book that has racist views in it, pretty clearly. There are a number of other books in that library that also have racist views. The fact that something is racist is not a determinant factor in removing it. Does Dr. Seuss get constitutional protection against being removed from public libraries? Every book gets protection. Okay, so I have here the ALA Weeding Handbook, which is also cited in the party's briefs. At page 106, it says, removing the Dr. Seuss books that are purposefully no longer published due to their racist content is absolutely acceptable because it's an act of basic collection maintenance. So if a librarian removes the cat in the hat, because there are scholarly books that say the cat in the hat is based on menstrual stereotypes, it's racist, if a public librarian removes the cat in the hat, has the public librarian violated the First Amendment? If the librarian removes the cat in the hat because he or she is substantially motivated by suppressing the viewpoint in it, then yes. So the library policy that's in place here and the correct principle that's in place is that the parents have to be responsible for curating instead of the library. So you're saying that the ALA Weeding Guide is unconstitutional? I'm not saying that. We don't know how this guide is actually applied in practice because many of these— If a librarian followed the ALA Weeding Handbook, which is cited in the briefs, the librarian violates the First Amendment? I have talked to librarians outside the record, and anecdotally, these types of things get used as a proxy for whether a book is outdated. But if a book continues to be checked out, it would be unconstitutional to remove— Wait, let me understand that. So if a librarian removed Dr. Seuss' cat in the hat because it's racist but it's outdated, because racism is outdated, then that doesn't violate the First Amendment? I think racism can be in a book, could be a proxy for outdated, but it would have to meet the must-be standards. And if it didn't meet the must-be standards in terms of people were still checking it out, people sometimes want to read racist books. It's something that you and I might not like, but they have a First Amendment right to do it, and that's the— Well, in your view, they have a First Amendment right to demand that the library have racist books on its shelves. They don't have a First Amendment right to demand any specific book in the same way that in Finley or Regan, you don't have the right to any particular subsidy. But what you have a right to is to make sure that the government is not administering that subsidy or that provision of benefits to the community in a way that discriminates by viewpoint. So let me ask it this way, then. Suppose someone goes to the library, public library, and is looking for the cat in the hat, and you go to the librarian and say, where's the cat in the hat? It's a classic children's book. The librarian says, well, we decided not to acquire the cat in the hat because it's  Does that person have the right to sue the library under the First Amendment to acquire the cat in the hat? I think we're dealing with the right to information here. Okay. There is a distinction between acquisition and removal. In the removal context, the government has already made the information available, and now it's taking it away. Well, what if the cat in the hat gets worn and smudged because so many people are checking it out, and so it gets mustied, and it's no longer there? And the librarian decides, you know, we're not going to replace the cat in the hat because it's racist. So does that violate the First Amendment? Um, I think that acquisition is a different topic. Why is it different if your concern is, over here, sorry. Your concern, I think, was the right to access information. Why does it matter if it was acquisition or removal? That's what I'm understanding. From the right standpoint of the reader, it's the same effect, isn't it? In one case, the government has already made it available, and I'm not saying that there is Well, the right's denied either way, isn't it? I'm just asking practically. Well, and practically speaking, I think, you know, this is a case that has an evidentiary record about removal, and this court does not need to. Okay, but presuppose another case where there's an evidentiary record about non-acquisition. Until you give me a principled reason to distinguish these two fact patterns, I don't see this as a terribly stable theory. Well, Judge Noble, I think that there could be a situation where you had, let's say you had a librarian, and he says, I'm not going to buy any books with a Christian viewpoint. They're just not going to be in my library. He writes it in an email, and then there's no books like that in the library. I think that you have a constitutional problem, and I don't think Okay, so it's not about acquisition versus removal. If I may, I'll have the floor up, quick question. I think your opening remarks said that there's nothing wrong with the government adopting certain viewpoints with respect to a monument. Did I understand you correctly? That's correct. What about a museum? I think with any kind of situation, you have to look to the three shirtless factors as I didn't say government speech. I'm just saying you said the government can absolutely express a viewpoint through a monument, and I think you're absolutely right. It would be weird to suggest otherwise. Governments could have monuments that further patriotism.  Could the government also do that with a museum? A museum? The government paid for a museum. There are lots of them in D.C., for sure, that further certain viewpoints. Patriotism being one, civil rights might be another. Would that be okay? I assume the answer is yes. And what about a library? I suppose, and this goes to the Walker example and some of the things Mr. Mitchell was saying about that, Walker was an example of a government speech case. I'm not talking about license plates. I asked about libraries. If a museum's okay, as you said, a monument can express a viewpoint and exclude other viewpoints by definition. Museums can favor certain viewpoints and exclude other viewpoints by definition. Libraries also. The government could, in theory, create a library where it only had its viewpoint, like it wrote all the books, it approved of all the books. Does it have to write them themselves or can it just go to the private market? I think to have something that sort of satisfies the standard in Walker, it would have to maintain exclusive control. Again, I'm open on the government speech question. I'm not asking about government speech. I'm asking, literally, if it's okay to express a viewpoint through a monument and through a museum, as you conceded it could be, why not a library? I think you're saying yes, probably. The government could express its view in a library if it maintained editorial and content control over every single book and it was adopting the viewpoint of those books because that's what government speech is, is when you take control of the viewpoint. This idea of- Why does it have to adopt the viewpoint? Why can't the government say, you know what, I want you to have this museum where you can hear this range of viewpoints, some of which are contradictory, but we think this museum will teach you. I assume that'd be okay if you're both sides of this museum. I think if you're starting to exclude viewpoints from a library, you have a constitutional problem. What about a museum? Again, if this museum is the Museum of Patriotism and the government is adopting the viewpoint of every single piece within the museum for purposes of sending out a message to the world, that's fine. The government can do that. That's like a monument. But the key is the endorsement of the message and that's the through line that runs through all these cases. Sir, does the Smithsonian have any current or past exhibits about the Civil War and about the Confederacy? I'm sorry, I don't know the answer to your question. Well, were they endorsing the Confederacy by having displays about it? I just, I don't know enough about it. In any kind of government speech situation, you would have to look at the shortlist factors. So Whitaker, let me ask you, you haven't used this phrase, I don't think, the right to receive information. Is that what we're talking about in your view under PICO, a constitutional right to receive information? It is a constitutional right to receive information. And that's the one that you're relying on. I've got a few steps I want to go with you. I want to make sure I'm going in the right direction. So do you agree with that? That is what you're basing at least part of your argument on? I do agree with you, Judge. Okay. In PICO, Rehnquist's dissent talks about if there is such a right, obviously he's dissenting, there's got to be a corollary right. And he uses the example that authors would have a right to insist that certain books be purchased. Work with that with me. Can you have the right to receive information without a corollary right to provide the information to the same library? And if not, why not? I think that it's the right to receive information is more of a general right. Some of the cases have referred to it as the sort of flip side of the right to speak. But take a case like Virginia Pharmacy Board. The consumers of the library books are in the exact same shoes as the consumers of the drugs in that case because they're trying to get information from the books just as the consumers in Virginia Pharmacy Board are trying to get information about drug prices. So that is how the right to information works. It's more of a general right. You don't look in a context-specific way. The court in Murphy approved that right, for example, to receive information from the internet. And the internet has a wide plurality of speakers, obviously, and it's the same right to information that would apply in the context of a library. Mr. Borden, is the issue of government speech even properly before us? Well, it is our position, Your Honor, that it has been waived because they did fail to raise it at the panel. We are dealing with this issue for the first time in these en banc proceedings in a type of doctrine where the Supreme Court has cautioned against expanding its scope. I think the best case for making a government speech argument would be one where the parties tried the case on that theory and they made the arguments in an orderly and proper fashion. And that's the reason for the waiver rule. But I understand that it is of high concern to this court, which is why we've been talking about it so much. How would you define the term outdated or outdatedness when we consider a curator's decision? Is it simply a matter of popularity that people are no longer interested in checking out Nancy Drew and Hardy Boy mystery books? Or is there something more to it? It sounds like from the material Judge Duncan was asking you about, that there's a whole set of factors that go into what makes a book or a publication outdated. How would you define the contours? Well, so in library standards, they have certain objective criteria. So if a book hasn't been checked out for a certain amount of time and it might be different for fiction and nonfiction, they have different standards. That would be the outdated part. If people in the community really were not interested in this book, that's how outdated books get. It's not based on content at all. It's based on simply the popularity of the book with the citizenry that uses the library. That's correct. That's an objective, non-viewpoint-based factor. And that's the way all the must-be factors are supposed to be. I'm just reflecting on Judge Ho's questions, and I often do. Would you have to draw a distinction between, say, the public, the presidential library system, which is run by the archives? Would that fit in or be in tension with your theory in as much as those libraries are run by the federal government? And clearly, there is full editorial content, quite a bit of viewpoint selection. That's correct, Your Honor. It's still the shirtless test. And you have to look at the history of the institution. You have to look at its historical practices. Is it controlling for the viewpoints historically? How much editorial control does it have over the viewpoint? That's why Walker is such an interesting case, because in that situation, Texas had traditionally had its own messages on the license plate, and it controlled everything about it. And then when it turned over the process to the private sector, it maintained control over every single license plate. And it actually took the IP after the license plate was issued and retained it. In the oral argument in Woolley, it was brought out that the New Hampshire live free and die. It turns out that the prisoners up in New Hampshire are the ones who actually make the license plate. Well, so counsel, I think Judge Higginson and you just were talking about the history of libraries. And I have to say, the party's briefing on history of libraries is a little bit thin. There's typically a citation to Ben Franklin and not much else. But there are actually books on the history of libraries. And they're in libraries. And it's well known that libraries, which arose in the mid-19th century, didn't stock novels for many, many years. They didn't stock novels, even though novels were very popular. They didn't stock novels because the people who ran public libraries thought novels were trashy. So they might not have had Madame Bovary or the Woman in White in the public library. So doesn't that count strongly against your argument that historically public libraries have not curated their decisions, their collections, based on their viewpoints about the worth of books? They didn't have novels. Well, I think that's a content-based distinction, right? Fiction or nonfiction, it's not judging the worth of any particular novel. It's not looking at whether Madame Bovary has controversial ideas in it. Oh, sure it did. People thought it was trash. People wanted theological works in the Bible in libraries. They didn't want Madame Bovary in it because it was trashy. That's like the word used. They didn't want trashy books. Those books, you'd have to go to circulating libraries to get those books. Now, today's different, right? Today, we have all kinds of trashy books in libraries. So you just gave me the Odyssey and the Iliad, which are not trashy. And any other kind of fiction would be out under that rule. And so it would be a content-based distinction as opposed to viewpoint. The ALA has... So today, you're saying if a public library decided to remove all fiction, that doesn't violate the First Amendment? I think it would be, you know, it might not be as an exciting library as it might be. Well, it'd be an awful library. But it would, but I mean, you know, and I assume the people of whatever county would rise up with pitchforks and cast out the county commissioner. But we're talking about the First Amendment. Does it violate the First Amendment for a library to say, enough with this trashy fiction? No more Stephen King. Violate the First Amendment? You're going to Stephen King. I think that if it was based on the viewpoint of trying to get rid of certain authors, I think you'd have a problem. I think if it was just that... Could the authors sue? Do they have a right to be in the library? I don't think that an author has a right to be in the library. I think that as long as you have a content-based distinction, like you're drawing between fiction and nonfiction, and the substantial motivation of that content-based restriction was not somehow to get rid of great writers like Stephen King, then... I don't understand that at all. Why wouldn't the author have a right? I mean, your whole point is that viewpoint discrimination is bad. Whose viewpoint are we talking about? It's the authors, obviously. So perhaps that's the perfect plaintiff. Well, there's a couple of kinds of viewpoint discrimination, and one kind is the kind described in Robinson v. Hunt County, which is if you are offended by the content of the work and you remove it for that reason. So that would be one kind of viewpoint discrimination. And then the other is if you're trying to suppress the viewpoint expressed. And I think we've had both of those kinds in the factual record in this case. But you have a huge mismatch in this case between the right that you're claiming. The right you're claiming is right to access of information, and then all of the ways that you cash that out, right? You don't have a right to actually demand that the library purchase the book. You obviously... Every single curation decision is going to involve the removal of that idea from the neutral, just because it was destroyed or damaged or whatever. That information is now gone from the library, and your constitutional right has been protected. And you said earlier that your understanding of the First Amendment applies to every book. You said every book demands protection. So I don't understand whose right it is that you're demanding to be protected or the remedy in which you're asking to protect it. It is the right of the library patrons, like our clients, to receive information from a public library. But why can't they demand that the books be purchased in the first place, then? People ask to have libraries purchase books, but it's different once the book is actually there and they want to get it, and the government has made this... I don't understand that at all. Let's suppose that one of these books that was actually removed from the children's section, that the facts were that the opportunity to purchase the book came up, and the library looked at that book and said, we don't think it's appropriate for 10 and under kids, so we're not going to purchase it. How is that possibly distinguishable from removing it from the children's section? I think that once you have made the book available to the public, you've given them the information and now you're taking it away from them. And it's a lot easier to suss out what's going on, as the Court pointed out in the Campbell decision itself, once you have made it available, a lot of the gating items that you look at in the acquisition, is this a good book relative to other books? Is it within our budget? Is there room on the shelves? All of those things go away, and the removal decision is easy to review in isolation. I do think that if the example that I gave where you had a librarian who was simply refusing to purchase books for a certain viewpoint, I think you would have a constitutional problem, and I don't think it would be a good idea to adopt a rule that gave the government absolute power over that kind of decision. So you would agree, wouldn't you not, sir? And I don't know what those musky or whatever those criteria say. You would agree that a librarian cannot remove the scarlet letter, which treats sex outside of marriage rather unfavorably, The Merchant of Venice, or Huck Finn, for obvious reasons. None of those can be removed from libraries. Would you agree with that? I would say— If they're even there anymore. I would hope all those books would be there, but you can't remove it from a library if your substantial motivation is based on the viewpoint. Huck Finn— No, no, no, no, no. You were citing the criteria about outdated views of sex, race, and religion. And all those have been—all these classics have been criticized for that reason. And that was my point to Judge Duncan, is you have books like Mein Kampf that are in the library. You have books like— I may even—the American Library Association—what bothers me about your argument is that what you are really trying to do is substitute the judgment of the public that pays for the libraries with the judgment of self-styled curators that are outside and unaccountable to the public, to an organized library association. That's all. The first— Counsel. I'm sorry. Go ahead and answer. The First Amendment protects unpopular speech. It protects the things that minority viewpoints say. And in those circumstances, the majority can oppress the minority. And that's why you have a First Amendment, is so that those kind of— Library associations speak for the minorities. Is that your point? My clients, in this case, are a minority in their community. They wanted certain books. They tried the political process. Ms. Green-Little went, and the community wouldn't talk to her. And the political process doesn't protect minority views and the right to receive controversial ideas or unpopular ideas. And that's what the First Amendment protects. It's easy case to say the First Amendment protects things that everybody agrees about. It's the hard case, like this one, where you have some controversial books, some controversial ideas. Counsel, what do you do, though, with Chief Justice Burger's dissent, which says that regardless of whether it's being couriers of third-party speech or whether it's government speech, the courts are the least institutionally competent people to be doing this, because, you know, we're going to see it as some sort of super board rather than it being in the communities of whether we're couriers of third-party speech. Can you help us on that? Sure, Your Honor. Campbell has been the law on the circuit for almost three decades. There has not been a flood of litigation under Campbell. There's not been a difficulty caused by that case. Judges are very good at figuring out intent. That's, you know, part of civil practice across a wide range of cases, you know, employment discrimination, trademarks, patents, even. When you, you know, so judges figure out intent. That's one of the things that judges are very good at doing. It hasn't been an issue under Campbell. There's been, you know, just a very small number of cases. Thank you, Campbell. We have your audience. Thank you, Your Honors. I appreciate the extra time.  Mr. Borden's presentation relies heavily on Mattel against Pound, but it bears repeating that the holding of Mattel is only that the trademarks themselves are private speech and not government speech. That's entirely consistent with our argument. We acknowledge that the library books themselves do not become government speech, and they remain private speech despite their inclusion in a public library's collection. However, if we go in the direction of government speech, looking at Shurtleff as a place where we find a lot of our guidance, there, there was a substantial record of how flags were flown at the Boston City Hall, and even the history of flag flying in the country. Maybe the record was mentioned in the opinion anyway. Maybe not the history of libraries, but the history of flag flying. We don't have such a record in this case. If there's a sense on this court that government speech might be the way to go, wouldn't it be appropriate to remand for some fact-finding on the factors and how this particular libraries and libraries in general have acted under those factors? No, Your Honor, I don't think that's proper at all. We have a robust record about how libraries engage in weeding practices. We have numerous weeding manuals in the record of this case that make clear that this is nothing at all like the flag flown in Shurtleff. Libraries have quality control. They are supposed to exercise quality control over the materials in their collection. They're also supposed to use weeding to ensure that their collection remains relevant to the needs of the community. This is not a situation where libraries are supposed to be taking all commerce in the way that Boston was with the flag until the Christian flag person showed up and wanted to fly his flag. So we have a robust record on this point about what libraries are supposed to do, what libraries have done historically, what weeding practices have been historically, and it's not a limited public forum. The panel recognized that as well. This is not a limited public forum, and the panel opinion, the lead panel opinion says that forum principles are out of place in a public library. And that's absolutely right, and it's supported by the record in this case. Second point that I want to make goes to Judge Higginson's question about Tina Castellan's testimony in the record. Castellan did testify that she disagreed with Amber Milam's application of the Mustney factors. But Castellan never said and no witness said that Milam was engaging in viewpoint discrimination when she weeded the books. Not only is there no accusation of viewpoint discrimination from any witness in this case, there's no evidence in the record that any of these books even have a viewpoint. This is a point Judge Southwick made in his panel concurrence where he said that the books about flatulence and backsides do not express a viewpoint. There's an even more fundamental problem here. None of the books were introduced into evidence, with one exception, In the Night Kitchen. That book is in the record at page 1821, and the court can read it and see for itself. That book has no viewpoint expressed. It's about a child who wakes up in the middle of the night or has a dream that he's falling into a bat of cake batter, and then he looks for milk. And then he winds up... You're saying basically we shouldn't reach any constitutional issues, that on this record there's been no viewpoint discrimination, and there's not even a viewpoint. So we should not reach any constitutional questions. If the court declines to overrule Campbell, it cannot affirm the preliminary injunction on a theory of viewpoint discrimination. The plaintiffs made a crucial concession before this en banc court. They previously argued throughout this entire litigation that content discrimination was constitutionally impermissible in public library reading decisions. They have now abandoned that stance, and they are saying only viewpoint discrimination is problematic. They have accused us falsely of reading books like In the Night Kitchen because of a picture of a naked toddler. That is not viewpoint discrimination. That is content discrimination. They've accused us of reading as perfectly normal because of pictures in the book that show adults engaged in sexual acts. That, again, has nothing to do with viewpoint. That is an objection to content, nudity. Now that they've said that only viewpoint discrimination is constitutionally problematic, they need to point to evidence in the record that shows, one, what the viewpoints of these books are, and two, they need to point to evidence to show that my clients were somehow hostile to the viewpoints in the books. They can't even get the first base. The books weren't introduced into the evidence except for In the Night Kitchen, so we don't even know whether these books have viewpoints. There's no way to figure that out. We have the possible exception of the book on the KKK because the title seems to imply the birth of the KKK, an American terrorist organization. Mr. Mitchell, in your rebuttal argument, you're now saying this case doesn't present a big First Amendment question, that instead the district court was clearly erroneous, dead wrong in its fact-finding, that someone like Tina Castellan, who said these books were not weeded, KKK and CAST were not weeded according to the library policy, KREW or MUSTING. You're saying without cross-examining her, we would still say the district court was dead wrong when it said viewpoint discrimination here? Because, Judge Higginson, Castellan didn't testify on viewpoint discrimination. She just said that she disagreed with Milam's application of the MUSTING factors, and the district court says in a footnote... I think, you know, 3903 to 315, she said these were not weeded according to the Llano County library policies or pursuant to KREW or MUSTING. That is what she said, that's right. The district court says in his opinion, in footnote 7, that reasonable librarians can disagree over how the MUSTING factors... Your argument now in rebuttal, where opposing counsel will not get back up, is this case is just a clear error case? No, no, that's not our argument, Judge Higginson. The court should overrule Campbell, that's our lead argument. If the court declines to overrule Campbell and keep Campbell out of the governing standard, it still should vacate the preliminary injunction because Judge Pittman relied on the plaintiff's representation in the district court that content discrimination was impermissible. And if you look at Judge Pittman's opinion, he hits us both on viewpoint discrimination, and he also says we discriminated on the basis of content. Now, before this court, the plaintiffs are saying content discrimination is constitutional, only viewpoint discrimination is impermissible. So in order to support the preliminary injunction, this court needs to find in the record clear evidence, evidence sufficient to make a clear showing that viewpoint discrimination occurred. We don't even have evidence in the record to show what the viewpoints of these folks might be. I guess, counsel, one of the concerns for me is you keep talking about a preliminary injunction, and that's what we're here on. Yes. The grant of a preliminary injunction in part. So doesn't it seem premature that we'd be making determinations about merits and overruling Campbell, when if we rule against you, all that happens is this case goes back to the trial court, and then there has to be some evidence or some hearing on whether or not to grant a permanent injunction? Yes, but Judge Graves, I think... Isn't that the foster of the case? But I think the court needs to make clear to the district court on remand what the legal standard is. There is so much disagreement and confusion right now because of Campbell. Campbell says it turns on the librarian's substantial motivation. That's all we have from the Campbell opinion. That's it. There's a piece of Campbell that quotes the Brennan plurality opinion in PICO, but I don't think that's the holding of Campbell. That's just a description of what Justice Brennan's plurality opinion is. There needs to be more clarification on remand about whether content discrimination is allowed, whether viewpoint discrimination is permissible, what counts as viewpoint discrimination, how to distinguish that, and whether we have any evidence in the current record that viewpoint discrimination incurred sufficient to support a preliminary injunction. All of that guidance is needed, not only for the district court on remand, but also for the parties, because we need to figure out how we're supposed to develop a factual record, and we don't have anything to go on just with Campbell. It's too vague of a task. I see my time has expired. I'm happy to answer any other questions that the court might have. I think the only other point that I would make is on Under the Moon, A Catwoman Tale. There is an Article III standing question that I believe the court needs to address before it can reach any of the merits questions, because there is no evidence in the record that any of the plaintiffs are suffering injury in fact from the removal of that book. If you look at the plaintiff's declarations... Your time has expired. Thank you, Your Honors. Stand adjourned.